IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AVID BOOKSHOP LLC,

Plaintiff,

v.

KEYBO TAYLOR, *et al.*,

Defendants.

CIVIL ACTION NO.
1:24-cv-01135-TRJ

## ORDER

On December 3, 2025, the parties filed cross motions for summary judgment. (Docs. 89, 90). Upon review and consideration, and with the benefit of oral argument, Defendants Gwinnett County Sheriff Keybo Taylor and Gwinnett County Jail Commander Benjamin Haynes' motion is **GRANTED**, and Plaintiff Avid Bookshop LLC's motion is **DENIED**.

## BACKGROUND

Plaintiff Avid Bookshop LLC ("Avid") is an online, independently owned bookstore headquartered in Athens, Georgia. (Doc. 90-3 at 2; Doc. 103 at 1). On three separate occasions, in May and July of 2023, Avid attempted to mail books on behalf of Avid customers to a Gwinnett County Jail inmate. (Doc. 86 at 25–26). Each time, the Jail returned the books because Avid was not an authorized retailer under Defendant Sheriff Keybo Taylor's "Communications, Mail and Visitation" policy (the "Old Policy"). (Doc. 89-4 at 1, 3; Doc. 90-5 at 7). The Old Policy provided that "books will be accepted [at the Jail] as long as they are mailed directly from the publisher or

an authorized retailer." (Doc. 81-2 at 3). The Old Policy did not define the term "authorized retailer." (*See* Doc. 89-4). Sheriff Taylor, however, "interpreted and applied this term . . . to mean the direct fulfilment services" of three large retailers: Amazon, Barnes & Noble, and Books-A-Million. (Doc. 84 at 18; Doc. 89-3 at ¶ 4; Doc. 81 at 21; Doc. 89-4). All other bookstores, like Avid, were prohibited. (Doc. 90-5 at 10).

According to Sheriff Taylor, shipments from local retailers pose two unique security risks to the Jail: (1) contraband—such as drugs, weapons, and pornography—entering the Jail in books; and (2) secretive communications to inmates through books. (*Id.* at 5). Unlike "large, e-commerce entities . . . with national logistics operations," at a local bookstore, Sheriff Taylor claims it is more likely that the "person shipping [and] handling the book during packaging[ ] has some personal connection to the Jail or an inmate," and thus "some incentive . . . to tamper with the book." (*Id.*) For these reasons, Amazon, Barnes & Noble, and Books-A-Million qualified as authorized retailers, and Avid did not. (*Id.*)

On March 15, 2024, Avid sued Sheriff Taylor and Gwinnett County Jail Commander Benjamin Haynes, alleging four claims:

- Count I: First Amendment Violation (42 U.S.C. § 1983);

- Count II: First Amendment Violation ("Prior Restraint");

- Count III: First Amendment Violation ("Unconstitutional Permitting Scheme"); and

- Count IV: Fourteenth Amendment Violation ("Unconstitutional Vagueness").

(Doc. 1 at ¶¶ 84–117). Avid amended its complaint on August 22, 2025. (Doc. 73).

On September 3, 2025, 18 months after Avid filed this action, the Jail replaced

the Old Policy with a new one (the "New Policy"). (Doc. 89-3 at ¶ 15; Doc. 89-5). The New Policy eliminated the term "authorized retailer" and provided a list of approved sources for book shipments: Barnes & Noble, Amazon.com, and the "Big Five Publishers." (Doc. 89-5 at 4–5). Under the New Policy, books from Barnes & Noble "must be ordered online and shipped directly from the Barnes & Noble warehouse to the inmate," and "[b]ooks shipped from Barnes [&] Noble retail stores will not be accepted." (*Id.* at 4). Similarly, books sent from Amazon.com "must be purchased directly from Amazon corporate supplies, not from third-party sellers." (*Id.*) Books-A-Million is no longer authorized to send books to the Jail. (*See id.*; Doc. 89-3 at ¶ 16). Small, local bookstores—like Avid—are still excluded under the New Policy. (*See* Doc. 89-5). On December 3, 2025, the parties filed cross motions for summary judgment. (Docs. 89, 90).

As of June 15, 2026, Avid is an exclusively online bookstore with no physical store front for customers to browse and purchase books.[1] (Doc. 103 at 1). Avid's owner, Janet Geddis, now receives and processes Avid's book shipments at Nest Athens, a home goods and gift shop in Athens. (*Id.* at 1–3). Since this transition, Avid's "procedure for securely processing books to be mailed to the . . . Jail is functionally the same as when Avid had its own [physical] store front." (*Id.* at 3). Rather than various Avid employees processing books for shipment, however, "Geddis is the only person to open and process shipments." (*Id.* at 3–5).

---

[1] On June 15, 2026, Avid filed a notice regarding changed circumstances to notify the Court "of its transition to exclusively online book retailing." (Doc. 103 at 1).

LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. In determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

The legal standard for cross-motions for summary judgment is not different from the standard applied when one party files a motion; cross-motions simply require of the court to determine whether either of the parties is entitled to judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). Cross-motions for summary judgment do not necessarily require the court to grant summary judgment to one side or the other, "unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.* at 1555–56; *see also Klim v. DS Servs. of Am., Inc.*, 225 F. Supp. 3d 1373, 1376 (N.D. Ga. 2015).

## DISCUSSION

In its motion, Avid argues that it is entitled to partial summary judgment on its First Amendment claims because the New Policy, which precludes local bookstores from mailing books to the Jail, violates its First Amendment rights. (Doc. 90-1 at 7). Defendants move for summary judgment on Avid's First and Fourteenth Amendment claims, arguing that: (1) the Fourteenth Amendment claim is now moot since Defendants repealed the offending policy; and (2) the First Amendment claims fail as a matter of law. (Doc. 89-1 at 11, 23). As to the First Amendment claims, both parties

argue that application of the four-factor test described in *Turner v. Safley*, 482 U.S. 78, 89 (1987) warrants entry of summary judgment in their favor. (Docs. 89-1, 90-1).

### A. First Amendment Claims

As an initial matter, no violation of the First Amendment could have occurred if Avid's book mailing is not constitutionally protected expression. Defendants argue that Avid's conduct of mailing books is not an expressive activity under the First Amendment. (Doc. 89-1 at 15–16). Avid, however, maintains that it has an "expressive right to communicate with Jail residents by sending them books," and that "[inmates] and their correspondents enjoy the protections of the First Amendment except to the extent that [jail] regulations curtailing those protections are reasonably related to legitimate penological interests." (Doc. 100 at 1, 3 (citation modified); Doc. 90-1 at 7).[2]

The Supreme Court has recognized that "prison walls do not . . . bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (citation omitted). "The right of freedom of speech . . . embraces the right to distribute literature." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982). And, "[inmates] and those 'reaching out' to them enjoy generally-existing constitutional rights related to legitimate penological interests." *Prison Legal News v. Livingston*, 683 F.3d 201, 214 (5th Cir. 2012). While Avid identifies no case directly on point, the Court concludes that Avid has a protected

---

[2] On April 14, 2026, Avid filed supplemental authority regarding whether it has a First Amendment interest in mailing books. (Doc. 100). Defendants filed their response on April 21, 2026. (Doc. 101).

First Amendment interest in mailing books to prisoners. *See id.* ("[Defendant's] argument that the First Amendment does not protect the right of outsiders to send unsolicited mail to inmates is unpersuasive."); *see also Thornburgh*, 490 U.S. at 407 (recognizing that "publishers who wish to communicate with [inmates] . . . have a legitimate First Amendment access to [inmates]").

Though Avid enjoys the right to send inmates books under the First Amendment, that right is not without qualification. *See Thornburgh*, 490 U.S. at 407. A jail "regulation affecting constitutional rights is valid as long as it is reasonably related to legitimate penological interests." *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 965 (11th Cir. 2018); *Thornburgh*, 490 U.S. at 407 (holding that regulations burdening senders' First Amendment rights are analyzed under the same standard as inmates' receiving rights) (citing *Turner*, 482 U.S. at 89). To determine whether a regulation is reasonably related to penological interests, courts apply the four-factor test set forth in *Turner*. 482 U.S. at 89. Under the *Turner* standard, courts consider:

> (1) whether the regulation is "rationally related" to a legitimate penological goal; (2) whether alternative means of exercising First Amendment rights remain open; (3) the impact that accommodating the asserted right will have on other prisoners and prison employees; and (4) whether there are easy and obvious alternative means of accommodating the asserted right.

*Perry v. Fla., Dep't of Corr.*, 664 F.3d 1359, 1364–65 (11th Cir. 2011) (citing *Turner*, 482 U.S. at 89–91). Under this standard, courts "must accord substantial deference to the professional judgment of [jail] administrators, who bear a significant responsibility for defining the legitimate goals of corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*,

539 U.S. 126, 132 (2003). All of Avid's First Amendment claims ultimately turn on whether the New Policy meets the *Turner* test.

### 1.  First *Turner* Factor: Rational Relation

Under the first factor, the Court must determine whether the New Policy is rationally related to a legitimate penological interest. *Turner*, 482 U.S. at 87. It is undisputed that promoting safety and security in the Jail is a legitimate penological goal. *Rodriguez v. Burnside*, 38 F.4th 1324, 1333 (11th Cir. 2022) (citation modified). The relevant inquiry, then, is whether prohibiting local bookstores from mailing books to inmates is rationally related to furthering safety and security in the Jail. *Id.*

The undisputed evidence demonstrates that a rational connection exists between prohibiting book shipments from small, local bookstores and furthering security in the Jail. According to Major John Gardner, who manages the incoming mail at the Jail, "[p]aper materials, including books, present a unique security concern for the Jail regarding contraband." (Doc. 89-3 at ¶ 20). For example, "the Jail has experienced an increase in instances of 'strips' or 'K2' being discovered in the Jail," which "are pieces of paper that have been coated with intoxicating chemical substances . . . often not noticeable or detectable to the naked eye." (*Id.*) Based on Major Gardner's experience in law enforcement, which includes 18 years working at the Jail, he testified that these drugs have "become a recent problem . . . due to the difficulty in detecting this form of drugs," and that "book shipments . . . are a recognized entry point for contraband . . . enter[ing] a jail." (*Id.* at 10, 12; Doc. 81 at 15). And though "the Jail has an x-ray-like machine that is able to detect when paper has potentially been tampered with," the Jail's "machine does not have the capability

to scan large amounts of stacked paper, like a bound paperback book." (Doc. 89-3 at ¶ 21). Sheriff Taylor also noted that books pose an increased risk of secretive communications and pornography entering the Jail. (Doc. 90-5 at 5).

To address these concerns, the New Policy excludes shipments from bookstores while permitting shipments from a handful of large retailers and publishers. (Doc. 89-3 at ¶¶ 5–6, 16). According to both Major Gardner and Sheriff Taylor, at a locally owned bookstore, it is more likely that an individual who has direct contact with an inmate can touch or otherwise tamper with a book then send it to the inmate in the Jail. (Doc. 81 at 82; Doc. 89-3 at ¶ 5; Doc. 90-5 at 5). Conversely, at the large e-commerce retailers and publishers authorized under the New Policy, "[i]t is less than likely that the person pulling the book off the shelf [to ship it to the inmate] has any direct connection or knowledge of the [inmate] who the book is being sent to." (Doc. 81 at 126–27). Thus, by allowing shipments only from "a few, well-known" retailers, the New Policy promotes security concerns by "limiting the risk that contraband (primarily drugs, weapons and pornography) will enter the Jail." (Doc. 89-3 at ¶ 5). It follows that the New Policy is a rationally calculated response to the risks involved in shipping books to inmates at the Jail. *See Rodriguez*, 38 F.4th at 1331.

Avid concedes that the Jail's security concerns are legitimate but argues that the exclusion of Avid and similar retailers under the New Policy is an unreasonable response. (Doc. 90-1 at 9). Specifically, Avid contends that "Defendants have not identified a single incident where contraband or secret communications were found smuggled inside of a book mailed to the Gwinnett County Jail" from a bookstore. (*Id.*) But Jail officials need not present "evidence of an actual security breach" to justify a

9

security policy—instead, Jail "officials . . . may *anticipate* security problems and adopt innovative solutions." *Rodriguez*, 38 F.4th at 1331 (citation modified). Here, the undisputed evidence shows that, based on their experience and concerns, the Jail officials restricted book shipments under the New Policy to anticipate and prevent contraband, unmonitored communications, and pornography from entering the Jail. (Doc. 89-3 at ¶¶ 5–6, 16; Doc. 81 at 126–27; Doc. 90-5 at 5). This is sufficient under *Turner. See Prison Legal News*, 890 F.3d at 968; *see also Rodriguez*, 38 F.4th at 1331.

Finally, Avid argues that the Jail's exception for religious organizations "highlight[s] the arbitrary nature of [the Jail's] [b]ookstore [b]an given that books sent by religious organizations could be tampered with beforehand to insert contraband." (Doc. 95 at 14–15; Doc. 90-1 at 22). Under the New Policy, there is a "Religious Organization Exception" which provides that: "Religious printed material (pamphlets, booklets, etc.) addressed to an inmate from a religious organization will be accepted." (Doc. 89-5 at 3). But the Jail is "allowed to accommodate inmates' religious practices by essentially exempting religious materials from [a] policy in order to meet [its] obligations under the Free Exercise Clause." *Bethel v. Jenkins*, 988 F.3d 931, 940 (6th Cir. 2021) (citing *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 135, 144–45 (1987)). As Major Gardner testified, the purpose of allowing shipments from religious organizations is to allow inmates to practice their religion(s), as protected under the First Amendment. (Doc. 83 at 10–16). Thus, the Religious Organization Exception does not make New Policy any less rationally related to a legitimate penological interest—and the limit on retail booksellers is reasonable. *See Bethel*, 988 F.3d at 940 n.5 (concluding that a similar religious

10

materials exception did not "undermine the nexus between the policy and the proffered penological interest" (citing *Bell*, 441 U.S. at 550)).

For these reasons, excluding small bookstores from the list of authorized retailers in the New Policy is rationally related to furthering security and safety in the Jail, and the first *Turner* element weighs in the Jail's favor. *See Bell v. Wolfish*, 441 U.S. 520, 550–51 (1979) (holding that a policy limiting shipments of books to inmates was "a rational response by prison officials to an obvious security problem"). And this conclusion holds even as Avid transitions to exclusive online book retailing. As Avid noted, its "procedure for securely processing books to be mailed to the . . . Jail is functionally the same," except that "Geddis is the only person to open and process shipments" rather than other Avid employees. (Doc. 103 at 3–5). Officials at the Jail explained that the New Policy excludes local bookstores because of the increased likelihood that the "person shipping [and] handling the book during packaging[ ] has some personal connection to the Jail or an inmate," and thus "some incentive . . . to tamper with the book." (Doc. 90-5 at 5). The risk contemplated by the Jail officials in excluding local bookstores—whether a physical store or online store—remains the same. And, as explained *supra*, a rational connection exists between excluding shipments from local bookstores and furthering safety and security at the Jail. *See Bell*, 441 U.S. at 550–51; *see also Rodriguez*, 38 F.4th at 1331.

### 2. Second *Turner* Factor: Alternative Means

The second factor is "whether there are alternative means" available to Avid to exercise its right to mail inmates books. *Turner*, 482 U.S. at 98. Under the New Policy, outsiders like Avid wishing to send inmates books can place orders shipped

directly from the approved retailers: Barnes & Noble, Amazon.com, or the "Big Five Publishers." (Doc. 89-5 at 4–5).

In its motion, Avid argues that this alternative means of sending books to inmates is insufficient because the New Policy still "categorically bars Avid from engaging in its core communication with Jail residents of providing books from a community-based, locally owned bookstore." (Doc. 90-1 at 14). But the New Policy need not provide "exact, one-for-one substitutes to provide alternative means." *Prison Legal News*, 890 F.3d at 972. "Adequate alternatives can exist even where [plaintiffs] are cut off from unique and irreplaceable activities." *Id.* To be sure, in *Turner*, the Supreme Court held that a regulation satisfied the alternative means factor where it did not "deprive [plaintiffs] of all means of expression," and instead prohibited "communication only with a limited class of other people with whom [jail] officials have particular cause to be concerned." 482 U.S. at 92. Similarly, here, the Jail officials identified concerns with books mailed from bookstores like Avid; both Sheriff Taylor and Major Gardner testified that books from unauthorized bookstores pose unique safety and security risks to inmates and employees working at the Jail. (Doc. 81 at 52; Doc. 84 at 74; Doc. 90-5 at 5). Because Avid has alternative means of sending books to inmates under the New Policy, the second factor indicates that the New Policy is reasonable. *Prison Legal News*, 890 F.3d at 973; *see also Livingston*, 683 at 219 ("The alternatives left open to [the plaintiff] to communicate its intended message to . . . inmates are extensive.").

The Court also recognizes that Avid views these alternative means, which would require it to purchase books from other large vendors, as "antithetical" to its

12

business model as small bookstore. (*Id.*; Doc. 85 at 127). "[B]ut *Turner* does not demand the ideal." *Prison Legal News*, 890 F.3d at 973. Where, as here, "there is some other way to exercise its right of access to inmates," the second factor is satisfied. *Id.* at 972.

### 3.  Third *Turner* Factor: Impact of Accommodating the Right

The "third consideration is the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of [jail] resources generally." *Turner*, 482 U.S. at 90. This factor, however, "sheds minimal additional light on the general reasonableness analysis" discussed above. *Livingston*, 683 at 219. In *Thornburgh*, the Supreme Court explained that where "the class of publications to be excluded is limited to those found potentially detrimental to order and security . . . [and] [w]here . . . the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' the courts should defer to the 'informed discretion of corrections officials.'" 490 U.S. at 418 (quoting *Turner*, 482 U.S. at 90, 92) (citation modified). As the Court held *supra*, Defendants established that the New Policy is reasonably related to the security and safety of inmates and the Jail's staff. (Doc. 81 at 9, 52, 191; Doc. 90-5 at 5–6). This alone is sufficient to find in favor of Defendants under the third factor. *Livingston*, 683 at 219.

In any event, the Jail presented evidence that it lacks the requisite resources to efficiently clear shipped books through security. For example, though "the Jail has an x-ray-like machine that is able to detect when paper has potentially been tampered with," this "machine does not have the capability to scan large amounts of stacked

paper, like a bound paperback book." (Doc. 89-3 at ¶ 21). To accommodate book shipments from vendors like Avid, officials at the Jail must "thumb[ ] through the pages and visually inspect[ ] the book." (*Id.*) Even then, Jail staff cannot detect K2 or "strips" on the paper via physical inspection alone. (*Id.* at ¶¶ 21–22). Accommodating Avid's book shipments would not only demand extra labor for staff at the Jail, but it would also hinder their ability to screen for contraband entering the Jail. (*Id.*) And "[w]hen accommodating [a plaintiff's] demands . . . would impair the ability of corrections officers to protect all who are inside a [jail's] walls," courts are "particularly deferential to [jail] administrators' regulatory judgments." *Overton*, 539 U.S. at 135 (citation modified). The third factor, therefore, also supports a finding that the New Policy is reasonable. *Id.*; *see also Rodriguez*, 38 F.4th at 1332.

### 4. Fourth *Turner* Factor: Easy Alternative or Exaggerated Response

Finally, the Court must consider whether there are any "obvious, easy alternatives" to the New Policy. *Turner*, 482 U.S. at 90. "This is a high standard, designed to flush out whether the current policy is an exaggerated response to the prison's concerns." *Rodriguez*, 38 F.4th at 1333 (citation modified) (citing *Overton*, 539 U.S. at 136). "[I]f [a plaintiff] can point to an alternative that fully accommodates the constitutional right at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner,* 482 U.S. at 91. With this in mind, Avid argues that the Jail could require "Avid to ship new books that have never been on . . . public bookshelves with written confirmation of [the] same," and that it can "readily provide written confirmation of chain of custody when shipping a book" to the Jail. (Doc. 90-

14

1 at 13; Doc. 103 at 3). This "easy alternative," according to Avid, would allow it to send Jail residents books while also accommodating Defendants' security concerns posed by shipments from a local store. (Doc. 90-1 at 13). Avid also argues that the existence of this proposed alternative, as well as other more inclusive penological policies, indicates that the New Policy is an exaggerated response to Defendants' security concerns. (*Id.*; Doc. 103 at 4–5).

In response, Defendants argue that Avid's proposed alternative is insufficient because it constitutes an individual exemption. (Doc. 92 at 22). To adequately state an alternative to the New Policy, Avid "must do more than propose a personal accommodation." *Rodriguez*, 38 F.4th at 1333. Providing the Jail with a "written confirmation" or unique chain of custody records for an Avid book shipment constitutes an individual accommodation; it is also not an obvious alternative "that could replace the current one on a [Jail]-wide scale." *Id.* (citing *Turner*, 482 U.S. at 93). Requiring officials at the Jail to review custody logs, identify names, and discern whether those names can be linked to the inmate on a case-by-case basis is neither "obvious" nor "easy." *See Turner*, 482 U.S. at 91. Even assuming Geddis provided written confirmation that she was the only individual handling the shipped books, such an alternative would likewise constitute a personal accommodation for Avid. *Rodriguez*, 38 F.4th at 1333 (*Turner* makes no . . . individualized demands[; i]t only requires a prison's policy be rationally related to a legitimate government interest."). Simply put, Avid's proposed alternatives cannot meet the "high standard" imposed under the final factor. *Id.* at 1332.

Avid also argues that the exclusion of it and similar bookstores under the New

15

Policy is an exaggerated response because it is "inconsistent with other prison and jail systems throughout the United States." (Doc. 90-1 at 11–12). "Although the policies followed at other well-run institutions are relevant to a determination of the need for a particular type of restriction, such policies are not necessarily controlling." *Prison Legal News*, 890 F.3d at 974 (citation modified). "[T]he Supreme Court has made it patently clear that the Constitution does not mandate a lowest common denominator security standard whereby a practice permitted at one penal institution must be permitted at all institutions." *Id.* (citation omitted). Thus, irrespective of other prison and jail systems' policies, the Jail's policy is sound so long as it comports with *Turner*; and, the New Policy does.

Ultimately, carceral institutions' policies "need only be reasonable." *Id.* (citation modified) (citing *Turner*, 482 U.S. at 93). As the Court explained *supra*, the New Policy, which aims to mitigate the risk of contraband, secretive communications, and pornography in the Jail, is reasonable. *See Prison Legal News*, 890 F.3d at 973. And, in any event, "[t]he burden . . . is not on the [jail] to prove the validity of prison regulations but on [the plaintiff] to disprove it." *Overton*, 539 U.S. at 132. Avid failed to carry its burden. Because all four *Turner* factors indicate that Defendants' policy is reasonable, the Court concludes that the New Policy does not violate the First Amendment.

### B. Fourteenth Amendment Violation (Unconstitutional Vagueness)

In its Amended Complaint, Avid alleges that the Old Policy was unconstitutionally vague because the terms "publisher" and "authorized retailer" were undefined and requested that the Old Policy be "enjoined from enforcement." (Doc. 73 at ¶¶ 12, 137). But in September 2025, the Old Policy was replaced with the

16

New Policy, which explicitly defines authorized book senders, including retailers and publishers. (Doc. 89-5 at 4–5). For this reason, Defendants argue Count IV is moot. (Doc. 89-1 at 23). The Court agrees.

"'The purpose of an injunction is to prevent future violations,' so for a claim for injunctive relief to remain a live controversy there must exist some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1283 (11th Cir. 2024) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). While a defendant's voluntary cessation of allegedly unlawful conduct ordinarily will not suffice to moot a case, a defendant can show mootness if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 1284 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). And though "it is true that the burden of proving mootness generally falls heavily on the party asserting it, governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." *Flanigan's Enters. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017). Once a government defendant shows a rescission of the challenged policy, "the burden shifts to the plaintiff to present evidence that its challenge has not been mooted by that" action. *Id.* (citing *Keohane*, 952 F.3d 1257, 1284 (11th Cir. 2020)). To do so, a plaintiff must demonstrate "a reasonable expectation (or substantial likelihood) . . . that the government will reverse course and reinstate the repealed policy if the lawsuit is terminated." *Id.* In evaluating whether a plaintiff has

17

met this burden, courts consider three factors:

> (1) whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction; (2) whether the decision to end the challenged conduct was unambiguous and can be fairly viewed as being permanent and complete; and (3) whether the government has consistently maintained its commitment to the new policy.

*Id.* at 1284–85 (citation modified) (quoting *Keohane*, 952 F.3d at 1268). And our Circuit has recognized that "[t]he Supreme Court has held almost uniformly that voluntary cessation by a government defendant moots the claim." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011) (citation modified).

Avid concedes that the New Policy "cured the vagueness concern" in the Old Policy, but that "a return to an 'authorized retailer' requirement without definitions or parameters would similarly violate the Fourteenth Amendment by failing to give retailers notice of what is prohibited." (Doc. 93 at 24). Avid does not argue that the change was impermanent or a temporary manipulation of this Court's jurisdiction; nor does it argue that Defendants' commitment to the New Policy is inconsistent. (*See id.*); *Cambridge Christian*, 115 F.4th at 1284–85. Instead, Avid simply argues that, if the Old Policy were reinstated, it would be unconstitutionally vague. (Doc. 93 at 24). But the relevant inquiry is not whether the Old Policy would be deficient upon its hypothetical reinstatement—instead, the Court must determine whether Avid has adequately shown a substantial likelihood that Defendants will indeed reinstate the Old Policy. *Cambridge Christian*, 115 F.4th at 1284–85. Avid fails to address this inquiry and the three factors discussed in *Cambridge Christian*. Once Defendants

18

adequately supported their voluntary cessation argument by establishing that the Old Policy was repealed, the burden shifted to Avid to demonstrate that it has a reasonable expectation that Defendants will reverse course and employ the Old Policy. *Cambridge Christian*, 115 F.4th at 1285. Avid made no such showing. Accordingly, Avid's claim for injunctive relief under the Fourteenth Amendment is mooted by the New Policy.

## CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment (Doc. 89) is **GRANTED**, and Avid's Motion for Summary Judgment on First Amendment Challenge (Doc. 90) is **DENIED**. The Clerk is respectfully **DIRECTED** to enter judgment in favor of Defendants Gwinnett County Sheriff Keybo Taylor and Gwinnett County Jail Commander Benjamin Haynes and against Plaintiff Avid Bookshop LLC, and to **CLOSE** this case.

SO ORDERED, this 8th day of July, 2026.

_____
TIFFANY R. JOHNSON
United States District Judge

19